UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| CINCINNATI INSURANCE COMPANY, as Subrogee of Todd's Snax, Inc., d/b/a Schultz Foods Company, | Case No. 08-CV-2734 (PJS/JJG) |
| Plaintiff, | ORDER |
| v. | |
| WACHOVIA BANK, NATIONAL ASSOCIATION, | |
| Defendant. | |

Sean J. Mickelson, TERHAAR, ARCHIBALD, PFEFFERLE & GRIEBEL, LLP, for plaintiff.

William F. Mohrman and Gregory M. Erickson, MOHRMAN & KAARDAL, PA, for defendant.

Todd's Snax, Inc., d/b/a Schultz Foods Company ("Schultz Foods"), issued a check in the amount of $153,856.46 to Amerada Hess Corporation. Thieves stole the check, changed the name of the payee to "Kenneth Payton," and induced Payton (an unwitting accomplice) to deposit the check into his account at TCF Bank ("TCF"). TCF presented the check for payment to Schultz Foods's bank, defendant Wachovia Bank ("Wachovia"), and Wachovia charged the amount of the check against Schultz Foods's account. By the time that Schultz Foods discovered the fraud, Payton had wired the funds to an overseas bank account, and the thieves had disappeared with the money.

The central question in this lawsuit is who must bear the $153,856.46 loss — Schultz Foods or Wachovia. For the reasons described below, the Court finds that, under the deposit agreement between Schultz Foods and Wachovia, Schultz Foods must bear the loss because

Schultz Foods failed to implement a fraud-detection program offered by Wachovia — a program that would have prevented the loss. The Court thus grants summary judgment to Wachovia.

I. BACKGROUND

Schultz Foods maintained a commercial checking account with Wachovia. Over the course of its relationship with Wachovia, Schultz Foods was the victim of check fraud on four separate occasions. Wachovia and Schultz Foods were able to amicably resolve the first three instances of check fraud. On those three occasions, Schultz Foods closed the compromised account and opened a new account, and Wachovia absorbed the fraud-related loss. The fourth occasion gave rise to this lawsuit.

In late 2005, Schultz Foods issued a check in the amount of $153,856.46 to Amerada Hess Corporation. The check was stolen before it could be deposited by the intended recipient. In what is known as a "washing" scam, thieves removed the name of the original payee from the check and substituted the name of Kenneth Payton — who, as noted, was an unwitting accomplice of the thieves. Payton then endorsed the check and deposited it into his account at TCF. TCF presented the check to Wachovia, and Wachovia transferred $153,856.46 from Schultz Foods's account at Wachovia to Payton's account at TCF. Following the instructions of the thieves, Payton then wired the money to a bank account in Singapore, and the thieves took the money and ran.

When the fraud came to light, Schultz Foods demanded that Wachovia re-credit its account, claiming that Wachovia must bear the loss because it processed the altered check in violation of § 4-401(a) of the Uniform Commercial Code ("UCC"). Wachovia disagreed, citing the fact that Schultz Foods had declined to implement "Positive Pay," a check-fraud deterrence

program that had been offered by Wachovia and that would have prevented the loss if Schultz Foods had only implemented it. According to Wachovia, under the terms of the deposit agreement between Schultz Foods and Wachovia, the failure of Schultz Foods to implement Positive Pay made Schultz Foods liable for the loss.

A word about Positive Pay: Unless a customer implements a program such as Positive Pay, a bank has little chance of identifying a forged or altered check, because a bank has no way of knowing whether a particular check was actually issued by a customer, whether a particular check was issued to the payee whose name appears on the check, or whether a particular check was issued in the amount that appears on the check. Positive Pay is a software program that enables a customer to transmit to its bank pertinent information about every check that the customer issues. For example, when a customer who uses Positive Pay issues check number 7394 to "Acme, Inc." in the amount of $15,286.25, the customer's bank is promptly *informed* that the customer has issued check number 7394 to "Acme, Inc." in the amount of $15,286.25. When a bearer then presents check number 7394 for payment, the bank's computer can compare the information on the check to the information that was transmitted by the customer. If the information does not match — if, for example, the name of the payee on check number 7394 is "Jane Smith" instead of "Acme, Inc." — the bank can contact the customer before clearing the check. Had Schultz Foods implemented Positive Pay, then, Wachovia would not have paid the "Kenneth Payton" check, and the loss would not have occurred.

Wachovia did pay the check, though, and thus $153,856.46 was deducted from the account of Schultz Foods. After Wachovia refused to re-credit the account, Schultz Foods filed a

claim with its insurer, plaintiff Cincinnati Insurance Company ("Cincinnati"). Cincinnati paid the claim and then filed this subrogation action against Wachovia.

Cincinnati contends that, when Wachovia deducted the amount of the altered check from Schultz Foods's account, Wachovia violated § 4-401(a) of the UCC. Wachovia responds that, under the terms of the deposit agreement between Schultz Foods and Wachovia, Schultz Foods's failure to implement Positive Pay makes Schultz Foods, and not Wachovia, liable for the loss. Cincinnati disputes Wachovia's interpretation of the deposit agreement. Cincinnati also argues that the risk-shifting provisions on which Wachovia relies are invalid, and Cincinnati contends that Wachovia waived its right to enforce those provisions.

## II. ANALYSIS

### A. *Standard of Review*

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

*B. The Releases*

Bank deposits and collections are governed by Article 4 of the UCC, which is codified in Pennsylvania as 13 Pa. Cons. Stat. §§ 4401-4504.[1]  Section 4-401(a) of the UCC (codified at 13 Pa. Cons. Stat. § 4401(a)) provides that "[a] bank may charge against the account of a customer an item that is properly payable from that account . . . . An item is properly payable if it is authorized by the customer and is in accordance with any agreement between the customer and the bank."  Ordinarily, if a bank charges a customer's account for a check that is *not* properly payable — for example, a check that has been forged and therefore has not been authorized by the customer — the bank will be liable to the customer for the loss under § 4-401(a).  But this is merely a default rule.  Section 4-103(a) of the UCC (codified at 13 Pa. Cons. Stat. § 4103(a)) permits banks and their customers to agree to a different rule, except that an agreement between a bank and a customer "cannot disclaim the responsibility of a bank for its lack of good faith or failure to exercise ordinary care."

Schultz Foods did not issue a check to Kenneth Payton.  Wachovia concedes that the altered check, as it was presented to the teller at Payton's bank, was not authorized by Schultz Foods.  Thus, the check was not "properly payable" under § 4-401(a), and, absent an agreement to the contrary, Wachovia is liable to Schultz Foods for charging the unauthorized check against the company's account.

---

[1]The parties agree that this action is controlled by Pennsylvania law.  Pennsylvania's codification of the UCC includes some minor stylistic changes to the UCC text.  Where the language of the Pennsylvania statute differs from that of the UCC, the Court quotes the Pennsylvania statute.

The problem for Schultz Foods is that there *is* an agreement to the contrary — a deposit agreement signed by Schultz Foods when it opened its commercial checking account at Wachovia. *See* Decl. Nusrat Jehan Bashir at Ex. 5 [Docket No. 36-4] (hereinafter "Deposit Agreement"). Section 12 of that agreement describes a variety of methods by which a customer can safeguard its account from fraud. These methods fall into two categories:

First, § 12 contains a non-exhaustive bullet-pointed list of "precautions" that customers "can and should take to decrease the risk of unauthorized transactions." "Precautions," as that word is used in § 12, are actions that any customer of any bank can take on its own to protect the security of its checking account. They include such common-sense measures as protecting the secrecy of passwords, promptly reviewing bank statements for unauthorized activity, and immediately reporting suspicious activity to the bank.

Second, § 12 provides that "[i]n addition" — that is, in addition to the "precautions" that customers can take on their own — Wachovia itself may make available to its customers "certain products and services that are designed to detect and/or deter check fraud." Unlike the "precautions," these "products and services" are developed by Wachovia (or purchased from vendors by Wachovia) and offered to customers. Obviously, these "products and services" will do nothing to prevent fraud unless a customer implements them.

After first describing the "precautions" that a customer can take on its own and then mentioning the "products and services" that Wachovia may offer the customer, § 12 of the deposit agreement concludes with a conditional release of Wachovia's liability:

> You agree that if you fail to implement any of these products or
> services, or you fail to follow these and other precautions
> reasonable for your particular circumstances, you will be
> precluded from asserting any claims against [Wachovia] for paying

> any unauthorized, altered, counterfeit or other fraudulent item that such product, service, or precaution was designed to detect or deter, and we will not be required to re-credit your account or otherwise have any liability for paying such items.

Deposit Agreement § 12.

Section 25E of the deposit agreement contains virtually identical language. That section begins with the customer's acknowledgment that Wachovia has made available "treasury services designed to reduce the likelihood that a fraudulent, unauthorized or altered check or other item will be paid." That section continues with the customer's acknowledgment that its failure to use such "treasury services" could "substantially increase" the likelihood of fraud. And that section concludes with another conditional release of Wachovia's liability — a release that is virtually identical to the release found in § 12 and quoted above.

There appears to be no dispute that Positive Pay was a "product or service" for purposes of § 12 and a "treasury service" for purposes of § 25E. There also appears to be no dispute that Positive Pay was made available to Schultz Foods, and that Schultz Foods chose not to implement it. Finally, there appears to be no dispute that Positive Pay was "designed to detect or deter" precisely the type of fraud that caused the $153,856.46 loss to Schultz Foods. On their face, then, the releases appear to absolve Wachovia of any responsibility for that loss.

Cincinnati nevertheless insists that neither § 12 nor § 25E bars Schultz Food's claim against Wachovia. As Cincinnati reads the releases, they apply only when the customer *neither* takes a "precaution" (such as promptly reviewing monthly statements) *nor* implements a "product or service" (such as Positive Pay). Schultz Foods did not implement any "product or service," but it did take several "precautions," including limiting the number of people with access to its account numbers and passwords and reviewing its monthly statements for

unauthorized charges.  Because Schultz Foods took precautions, Cincinnati argues, the releases found in § 12 and § 25E do not apply.  As Cincinnati reads those releases, "only those customers that have completely failed to take any measures to protect an account" will be barred from asserting a claim against Wachovia for an unauthorized item.  Pl. Br. Opp. S.J. at 15.

But this is not a natural reading of the language at issue.  Again, the releases provide that "if you fail to implement any of these products or services, or you fail to follow these and other precautions reasonable for your particular circumstances, you will be precluded from asserting any claims against [Wachovia] . . . ."  Through the use of the disjunctive "or," the releases make clear that a customer will be precluded from making claims against Wachovia if the customer *either* fails to implement a "product or service" *or* fails to take a reasonable "precaution."  Schultz Foods failed to implement a "product or service," and thus its claim against Wachovia is precluded.

Cincinnati's interpretation would rewrite the releases by substituting the word "and" where the releases use "or."  As Cincinnati would have it, a customer would be precluded from making claims only when the customer "fail[s] to implement any of these products and services, *and* . . . fail[s] to follow these and other precautions reasonable for your particular circumstances."  But that is not what the releases say.

Moreover, Cincinnati's interpretation of the releases would render them useless.  Again, according to Cincinnati, if a customer takes even *one* "precaution," the releases would not apply.  If, say, a customer promptly notified Wachovia whenever its checkbook was stolen, then the releases would not bar that customer from bringing fraud-related claims against Wachovia, even if the customer published its account number and password on the front page of the *Wall Street*

-8-

*Journal*, encouraged readers to steal money from the account, and failed to notify Wachovia of the thefts until the account had been emptied. Given that just about every customer of Wachovia presumably takes at least one precaution — such as not disclosing passwords to strangers — Cincinnati's reading of the releases would render them pointless.

Wachovia's reading of the releases not only comports with their language, but makes sense. Under the releases, a customer is required to take *all* precautions that are "reasonable for [the customer's] particular circumstances." If a customer fails to act reasonably by taking a precaution, and the customer's unreasonable omission leads to a fraud-related loss, then the customer must bear the loss. That makes sense. Likewise, a customer is required to implement *all* "products or services" offered by Wachovia to prevent fraud. If a customer fails to do so, and its failure leads to a fraud-related loss, then the customer is responsible for that loss. That, too, makes senses. The releases are clear, and they reasonably assign risk to Wachovia when the customer takes reasonable precautions and implements anti-fraud products and services, and assign risk to the customer when the customer does not take reasonable precautions or refuses to implement anti-fraud products and services.

In sum, Wachovia offered a "product or service" to Schultz Foods; Schultz Foods failed to implement that "product or service"; and had Schultz Foods implemented that "product or service," Wachovia would not have paid $153,856.46 to Kenneth Payton. Under the plain language of the releases, Schultz Foods is precluded from asserting any claims against Wachovia for making that payment, and Wachovia is not required to re-credit Schultz Foods's account.

*C. Validity of the Releases*

Cincinnati argues that even if the releases purport to bar Schultz Foods (or its subrogee) from seeking to recover $153,856.46 from Wachovia in this action, Wachovia cannot rely on the releases because the releases are invalid for a variety of reasons. The Court addresses Cincinnati's arguments in turn.

1. Generally

Cincinnati first argues that banks are strictly liable under § 4-401(a) of the UCC for charging against the account of a customer an item that is not properly payable. Cincinnati further argues that a bank and a customer may not enter an agreement that absolves the bank of this strict liability. In support of its argument, Cincinnati relies almost entirely on *Cumis Insurance Society v. Girard Bank*, 522 F. Supp. 414 (E.D. Pa. 1981).

Cincinnati is right on the first point, but wrong on the second. It is indeed true that, under § 4-401(a), "ordinarily a bank is strictly liable for charging a customer's account with an amount that the customer had not authorized the bank to pay." *Travelers Cas. & Sur. Co. of Am. v. Wells Fargo Bank N.A.*, 374 F.3d 521, 525 (7th Cir. 2004). And thus *Cumis* was accurate (or at least accurate enough) in characterizing § 4-401 as imposing "strict liability" on a bank for paying an unauthorized check. 522 F. Supp. at 419, 421.

At the same time, "a bank and its customer can contract out of that strict liability." *Travelers*, 374 F.3d at 525. Section 4-103(a) clearly provides that, within certain limits, "[t]he effect of the provisions of this division may be varied by agreement." And *Cumis* itself acknowledged that a bank can contract out of the "strict liability" imposed by § 4-401(a); *Cumis* simply held that, under the circumstances of the particular case, the bank had failed to do so.

-10-

522 F. Supp. at 422-23. In sum, Cincinnati's contention that a bank cannot contract out of the strict liability imposed under § 4-401(a) is contradicted not only by § 4-103(a), but by the very decision on which it relies.

Cincinnati next argues that the releases are not valid because they purport to excuse Wachovia from exercising ordinary care. Section § 4-103(a) places limits on the ability of parties to use a contract to vary the provisions of Article 4 of the UCC. Under § 4-103(a), for example, the parties "cannot disclaim the responsibility of a bank for its lack of good faith or failure to exercise ordinary care." Cincinnati points out that the releases in the deposit agreement between Wachovia and Schultz Foods would, on their face, protect Wachovia from liability for paying an unauthorized check even if Wachovia failed to exercise ordinary care. Therefore, argues Cincinnati, the releases are invalid under § 4-103(a).

It is important to emphasize that Cincinnati does not allege that Wachovia in fact failed to exercise ordinary care in paying the unauthorized check to Payton. In other words, Cincinnati does not allege that giving effect to the releases *in this case* would permit Wachovia to evade its nonevadable responsibility to exercise ordinary care. Cincinnati is instead complaining that the releases are overbroad — and thus, in some *other* case, giving effect to the releases would permit Wachovia to evade its responsibility to exercise ordinary care in violation of § 4-103(a).

Cincinnati is certainly correct in arguing that the releases are overbroad. But Cincinnati is incorrect in arguing that, because the releases cannot be applied to *some* cases, they cannot be applied to *any* case. Section 46 of the deposit agreement provides:

> If there is any conflict between this Agreement and applicable federal or state law, this Agreement will be considered changed to the extent necessary to comply with the law. If any provision in

-11-

> this Agreement is declared to be invalid, unenforceable or illegal,
> that part will not affect the validity of other provisions.

This is a severability clause. It provides, in essence, that if some part of the deposit agreement is invalid, the remaining parts of the agreement remain in effect. Some parts of the Wachovia deposit agreement are indeed invalid: the parts of the releases found in § 12 and § 25E that apply to claims that Wachovia failed to exercise ordinary care in paying unauthorized checks. Under the severability clause in § 46, however, the remainder of the deposit agreement remains in effect, including the remainder of the releases found in § 12 and § 25E. In this action, Wachovia is relying on the valid parts of the releases, and, under § 46, those parts are enforceable.

### 2. Reasonableness of the Releases

Section 4-103 imposes a couple of "reasonableness" requirements on the attempts of parties to use contracts to vary the provisions of Article 4 of the UCC.

First, as discussed above, § 4-103(a) forbids the parties to an agreement to "disclaim the responsibility of a bank for its lack of good faith or failure to exercise ordinary care." Section 4-103(a) goes on to clarify that "the parties may determine by agreement the standards by which the responsibility of the bank is to be measured," but only "if those standards are not manifestly unreasonable." Thus, § 4-103(a) allows parties to agree to the standards by which a bank's responsibility to exercise ordinary care will be measured, as long as the agreed-upon standards are not "manifestly unreasonable."

Second, § 4-103(d) provides generally that "[t]he specification or approval of certain procedures by this division is not disapproval of other procedures that may be reasonable under the circumstances." Section 4-103(d) emphasizes that parties have the freedom to agree to

"procedures" that vary from those provided in Article 4, as long as the agreed-upon procedures are "reasonable under the circumstances."

As discussed at length, the deposit agreement between Wachovia and Schultz Foods required Schultz Foods either to implement Positive Pay or to assume responsibility for any fraud losses caused by its failure to implement Positive Pay. Cincinnati and Wachovia agree that these provisions are subject to the "reasonableness" requirements of § 4-103, although they disagree about whether the appropriate standard is the "manifestly unreasonable" standard of § 4-103(a) or the "reasonable under the circumstances" standard of § 4-103(d). The Court need not resolve the dispute because the Court finds that the relevant provisions of the deposit agreement are not "manifestly unreasonable" for purposes of § 4-103(a) and are "reasonable under the circumstances" for purposes of § 4-103(d).

As the parties agree, reasonableness under either standard is a function of (1) the technical feasibility of implementing Positive Pay and (2) the cost of installing and participating in the program. Cincinnati conceded at oral argument that it was technically feasible for Schultz Foods to implement Positive Pay. *See also* Morrison Decl. ¶¶ 13-16. Cincinnati also conceded that Schultz Foods could have configured its existing computer system to work with Positive Pay for less than $500. Although implementing Positive Pay would have required Schultz Foods to pay modest monthly and per-check fees, Wachovia asserts (and Cincinnati does not dispute) that these fees would have been more than offset by credits that Wachovia extends to Pennsylvania customers in lieu of interest. Def. Br. S.J. 10-11. It is clear, then, that Wachovia acted reasonably in requiring Schultz Foods either to implement Positive Pay or to assume responsibility for fraud-related losses that could have been prevented by Positive Pay.

Cincinnati nevertheless insists that requiring Schultz Foods to implement Positive Pay was unreasonable — not because the cost of implementation was *in fact* unreasonable, but because Schultz Foods mistakenly *believed* that the cost of implementation was unreasonable. Cincinnati contends that Schultz Foods wrongly thought that it would cost tens of thousands of dollars to implement Positive Pay. Cincinnati does not allege that Wachovia misled Schultz Foods about the cost of Positive Pay or even that Wachovia knew of Schultz Foods's mistaken belief. Instead, Cincinnati seems to allege that Schultz Foods simply assumed that implementing Positive Pay would be expensive and that its mistake was never corrected — either by Schultz Foods asking Wachovia about the actual costs or by Wachovia volunteering information about the actual costs.

Cincinnati cites no authority suggesting that, under § 4-103, the reasonableness of standards or procedures imposed under an agreement is to be judged based on the subjective beliefs of the parties to that agreement. The absence of supporting authority is unsurprising, as a subjective standard would be unworkable. Under an objective standard, a court can look at the face of an agreement and assess the reasonableness of the obligations actually imposed. But under a subjective standard, the validity of any agreement would turn not (or not just) on what was in the agreement, but on what was in the heads of the parties to the agreement. The Wachovia deposit agreement — an agreement that has presumably been signed by countless customers — would be valid in some cases and not valid in others, depending on what the particular customer *believed* about the obligations imposed by the agreement. Just as an agreement that imposes unreasonable obligations should not be valid if a customer mistakenly

believes the obligations to be reasonable, an agreement that imposes reasonable obligations should not be invalid if a customer mistakenly believes the obligations to be unreasonable.

In this case, the Positive Pay obligation imposed by the deposit agreement was unquestionably reasonable. Schultz Foods mistakenly reached a contrary conclusion, but there is no evidence that Wachovia misled Schultz Foods about the cost of Positive Pay (indeed, it would have been irrational for Wachovia to do so), and there is no evidence that Wachovia was even aware of Schultz Foods's mistake. Under these circumstances, the Court holds that the relevant provisions of the deposit agreement are not "manifestly unreasonable" for purposes of § 4-103(a) and are "reasonable under the circumstances" for purposes of § 4-103(d).

### D. *Waiver of Right to Enforce the Releases*

Cincinnati finally argues that, even if the releases in the deposit agreement are valid, Wachovia waived its right to enforce those releases through its conduct.

As explained above, Schultz Foods's account at Wachovia has been the subject of unauthorized activity on three prior occasions. After the first incident in March 2002, Wachovia suggested that Schultz Foods either close its account or implement Positive Pay. Mickelson Aff. Ex. 1 [Docket No. 43]. Schultz Foods closed its account but did not implement Positive Pay. After the second incident in October 2003, Wachovia did not recommend that Schultz Foods close its account. Mickelson Aff. Ex. 2. After the third incident in September 2004 — an incident that did not result in any loss to Schultz Foods — Wachovia told Schultz Foods that if its account became compromised, Schultz Foods should either close its account or implement Positive Pay. Mickelson Aff. Exs. 3-4. Out of caution, Schultz Foods closed its account but again did not implement Positive Pay. Mickelson Aff. Exs. 5-6.

Wachovia did not require Schultz Foods to absorb any fraud-related loss in connection with any of the three incidents, even though Schultz Foods never implemented Positive Pay. Based on these experiences, Cincinnati claims that Schultz Foods "had an expectation that Wachovia would reimburse Schultz Foods' account" for unauthorized charges so long as Schultz Foods took precautions such as closing its account. Pl. Br. Opp. S.J. at 7.

If Schultz Foods had such an "expectation," it was only because it did not read § 43 of the deposit agreement, which contains the following anti-waiver provision:

> **WAIVER OF RIGHTS BY THE BANK.** We reserve the right to waive the enforcement of any of the terms of this Agreement with respect to any transaction or series of transactions. *Any such waiver will not affect our right* to enforce any of our rights with respect to other customers or *to enforce any of our rights with respect to later transactions with you* and is not sufficient to modify the terms and conditions of this Agreement.

Deposit Agreement § 43 (emphasis added). This provision is clear: By voluntarily protecting Schultz Foods from its fraud losses in the past, Wachovia did not give up its right to enforce the releases in this action.

ORDER

Based on the foregoing and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. The motion of defendant Wachovia Bank, National Association for summary judgment [Docket No. 33] is GRANTED.

2. Plaintiff's complaint is DISMISSED WITH PREJUDICE AND ON THE MERITS.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: July 14, 2010                      s/Patrick J. Schiltz
                                                      Patrick J. Schiltz
                                                      United States District Judge